# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

JONAS HENDERSON, II,
      Petitioner,

v.
                                      Case No. 8:20-cv-2370-KKM-SPF

SECRETARY, DEPARTMENT
OF CORRECTIONS,
      Respondent.
_____

## ORDER

Jonas Henderson, II, a Florida prisoner, timely[1] filed a pro se Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254, challenging his state-court convictions for resisting an officer with violence and battery on a law enforcement officer. (Doc. 1.) Having considered the petition, (*id*.), and the response in opposition, (Doc. 13), the petition is denied.[2] Because reasonable jurists would not disagree, Henderson is also not entitled to a certificate of appealability.

## I.    BACKGROUND

### A. Procedural Background

A state-court jury convicted Henderson of resisting an officer with violence and battery on a law enforcement officer. (Doc. 13-2, Ex. 5.) After finding that

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* 28 U.S.C. § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See id.* § 2244(d)(2). Henderson's convictions and sentences were affirmed on February 14, 2018. (Doc. 13-2, Ex. 12.) His judgment became final 90 days later, on May 15, 2018, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 105 days of untolled time elapsed, Henderson filed his state postconviction motion on August 29, 2018. (*Id.*, Ex. 14.) The motion remained pending until the state appellate court's mandate issued on July 8, 2020. (*Id.*, Ex. 19.) That gave Henderson until March 26, 2021, to file his § 2254 petition. He met the deadline by filing his petition on October 2, 2020. (Doc. 1 at 19.) Thus, the petition is timely.

[2] Henderson did not file a reply.

1

Henderson qualified as a habitual felony offender and a prison releasee reoffender, the state trial court sentenced him to concurrent terms of ten years' imprisonment on each count. (*Id*, Ex. 7.) The state appellate court per curiam affirmed the convictions and sentences. (*Id.*, Ex. 12.) Henderson moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (*Id.*, Ex. 14.) The state postconviction court denied the motion, and the state appellate court per curiam affirmed the denial of relief. (*Id.*, Exs., 15, 18.) This federal habeas petition followed. (Doc. 1.)

### B. Factual Background[3]

On the evening of November 22, 2014, Officer Michael Waldron responded to a suspected burglary of a motel room in Lake Wales, Florida. (Doc. 13-2, Ex. 3, at 143–44.) He entered the room, spoke to the victim, and unsuccessfully attempted to collect fingerprints. (*Id.* at 144–45.) The victim told Officer Waldron that the suspect had stolen several items and left behind a jacket. (*Id.*) Officer Waldron returned to the Lake Wales police station and filled out an incident report. (*Id.* at 145.)

Approximately two hours later, Officer Waldron was dispatched to the same location. (*Id.* at 146, 170.) The victim had called to report that a "suspicious person" was knocking on the door and requesting the return of "items" that "had been left in the . . . motel room." (*Id.* at 146.) When Officer Waldron arrived at the scene, he saw a four-door sedan parked "right in front" of the room. (*Id.* at 147.) Henderson was in the front passenger seat; another male was in the driver seat. (*Id.* at 147, 150.)

---

[3] The factual background is based on the trial transcript.

Officer Waldron left the police cruiser and walked toward the sedan. (*Id.* at 148.) As he approached, Henderson exited the vehicle and became "very confrontational," saying, "What the f*** are you doing here? Why are you here?" (*Id.*) Officer Waldron explained that he was "investigating a call." (*Id.* at 149.) Henderson said that some people "were fighting" nearby, and that if Officer Waldron left "now," he could still "catch them." (*Id.*) There were no "reports of a fight in that area at that time." (*Id.* at 150.)

Officer Waldron approached the driver's side of the vehicle. (*Id.*) When the driver opened the door, Officer Waldron immediately smelled cannabis. (*Id.* at 150–51.) He ordered the driver to step out of the vehicle and told him he was being detained. (*Id.* at 151.) The driver consented to a search of the car. (*Id.*) After handcuffing the driver, Officer Waldron conducted the search. (*Id.* at 152.) He found a "balled up" jacket in the passenger floorboard. (*Id.*) Underneath the jacket were several packets of what Officer Waldron suspected to be K2, a form of synthetic marijuana. (*Id.*)

During the search, Henderson was "pacing back and forth" outside the car and "yelling about illegal search and seizure." (*Id.* at 153.) By this time, Officer Tiffany Holden had arrived and was trying to calm Henderson down. (*Id.*) Henderson "kept backing away" from Officer Holden, and his arms "were swinging back and forth." (*Id.*) Officer Waldron decided to detain Henderson based on "[t]he smell of cannabis coming from the vehicle" and the "suspected K2" in the passenger floorboard. (*Id.* at 153–54.)

Officer Waldron approached Henderson, told him he was "being detained," and grabbed his left hand. (*Id.* at 154.) Henderson tried to "spin away" from Officer

Waldron, who responded by pushing him into a nearby vehicle to "get his left arm behind his back." (*Id.*) Officer Holden drew her Taser and told Henderson to "stop resisting." (*Id.*) Undeterred, Henderson elbowed Officer Waldron in the face and ran off. (*Id.*) Officer Holden fired her Taser, but it "had no effect," and Henderson was able to "rip the prongs out" of his body. (*Id.* at 154–55.) Officer Waldron pursued Henderson, pulled out his Taser, and said, "[S]top running or you're going to get ta[s]ed." (*Id.* at 157.) Officer Waldron fired the Taser, but it had limited effect—one of the prongs fell out, and Henderson was able to pull the other one off his body. (*Id.*)

Officer Waldron tackled Henderson after the latter "got tangled up" on a waist-high, chain-link fence. (*Id.* at 158.) As he was lying face down on the ground, Henderson elbowed Officer Waldron in the face and chest. (*Id.*) Henderson "spun around," tried to push Officer Waldron away, and began punching him in the face. (*Id.* at 158–59.) Officer Waldron again applied his Taser to Henderson, but it had "no effect." (*Id.*) Both men got up, and Henderson assumed a "boxer's . . . stance." (*Id.* at 159.) Officer Waldron approached, and Henderson ran off. (*Id.* at 160.)

Eventually, Henderson "had nowhere else to go," so he "turned around" and "charged" at Officer Waldron. (*Id.* at 162.) Officer Waldron was able to pin Henderson to the ground. (*Id.* at 164.) At this point, Officer Holden caught up with the men. (*Id.*) She pulled out her gun, pointed it at Henderson, and said, "[S]top, you are going to get shot; stop fighting." (*Id.*) Henderson stopped "fighting as hard," and Officers Waldron and Holden were finally able to handcuff him. (*Id.* at 164–65.) The officers placed Henderson in a patrol car. (*Id.* at 165.) There, he made several "confrontational statements" to Officer Waldron, including, "I whooped

your p**sy ass, you motherf*****. I whooped your ass. Uh-huh. Take these handcuffs off." (*Id.* at 165–66.)

## II.   STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law

"if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id*. at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). But the habeas court is "not limited by the particular

6

justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioner's factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state-court decision may still be reasonable "even if some

of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.* (quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

In addition to satisfying the deferential standard of federal court review of a state-court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation. *Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental

miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

III.   **INEFFECTIVE ASSISTANCE OF COUNSEL**

Henderson brings claims for ineffective assistance of trial counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors,

the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.   <u>ANALYSIS</u>

### A. Ground One—Failure to Impeach Officer Waldron

Henderson contends that trial counsel was ineffective for failing to impeach Officer Waldron with his deposition testimony. (Doc. 1 at 5–7.) At trial, Officer Waldron testified that he tackled Henderson after the latter tripped over a fence. (Doc. 13-2, Ex. 3, at 158.) Officer Waldron stated that, during this part of the encounter, Henderson elbowed him in the face and chest and punched him in the face. (*Id.* at 158–59.) At his deposition, however, Officer Waldron did not claim that Henderson punched him. (Doc. 1 at 6.) Instead, he testified that Henderson "tried to elbow him off and pushed his face." (*Id.*) Henderson faults counsel for failing to exploit the discrepancy between (1) Officer Waldron's deposition testimony that Henderson "pushed" his face and (2) Officer Waldron's trial testimony that Henderson punched his face. (*Id.* at 6–7.)

The state postconviction court rejected this claim. It held that, although Officer Waldron "at his deposition may not have detailed his battery by [Henderson] in as much detail as he did at trial," the discrepancy in his statements did not "necessarily constitute effective impeachment." (Doc. 13-2, Ex. 15, at 2.) The court then found that, even assuming "counsel was ineffective," there was "not a reasonable probability the result of [Henderson's] trial would have been different had trial counsel attempted to impeach the officer as suggested by [Henderson]." (*Id.*) The court reasoned that the "[e]vidence present[ed] at trial through the testimony of Officers Waldron and Holden was overwhelming as to [Henderson's] guilt of both resisting an officer with violence and battery o[n] a law enforcement officer." (*Id.* at 2–3.)

The rejection of this claim was reasonable. To show prejudice under *Strickland*, Henderson must "establish a reasonable probability that, but for counsel's [failure to impeach Officer Waldron with his prior statements], the outcome at trial would have been different." *Reed v. Sec'y, Fla. Dep't of Corr.*, 767 F.3d 1252, 1261 (11th Cir. 2014). Ineffective assistance "will not be found merely because other testimony might have been elicited from those who testified." *Fugate v. Head*, 261 F.3d 1206, 1220 (11th Cir. 2001). Likewise, "[c]laims that an attorney should have cross-examined further on inconsequential matters do not establish constitutionally deficient performance." *Johnson v. Alabama*, 256 F.3d 1156, 1186 (11th Cir. 2001). The Eleventh Circuit has, however, "found ineffective assistance where counsel failed to impeach the key prosecution witness with prior inconsistent testimony [that] was much more favorable to the defendant." *Fugate*, 261 F.3d at 1219 (collecting cases).

Henderson cannot show that he was prejudiced by the failure to impeach Officer Waldron with his deposition testimony. According to Henderson, counsel should have exploited the discrepancy between Officer Waldron's testimony (1) that Henderson "pushed" his face and (2) that Henderson punched his face. (Doc. 1 at 6–7.) But Officer Waldron's deposition testimony was not "much more favorable to" Henderson than his trial testimony. *Fugate*, 261 F.3d at 1219. Indeed, regardless of whether he punched or pushed Officer Waldron, Henderson's conduct would plainly satisfy the elements of resisting an officer with violence and battery on a law enforcement officer. *See Larkins v. State*, 476 So. 2d 1383, 1385 (Fla. 1st DCA 1985) ("Resisting an officer with violence consists of 1) knowingly 2) resisting, obstructing or opposing a law enforcement officer 3) in the lawful execution of any legal duty 4) by offering or doing violence to his person."); *Miller v. State*, 636 So. 2d 144, 150 (Fla. 1st DCA 1994) ("The elements of the offense of battery on a law enforcement officer are: 1) knowingly 2) actually 3) intentionally 4) touching or striking 5) against the will 6) of a law enforcement officer 7) engaged in the lawful performance of his duties.").

Moreover, as the state postconviction court correctly found, there was "overwhelming" evidence of Henderson's guilt. (Doc. 13-2, Ex. 15, at 2–3.) Both officers testified that Henderson repeatedly struck Officer Waldron while the latter was attempting to detain him. And, once he was in the patrol car, Henderson himself bragged about having "whooped" Officer Waldron. (*Id.*, Ex. 3, at 165–66.) Because the prosecution presented "substantial evidence" of Henderson's guilt, "there is not a reasonable probability that the outcome of the trial would have been different had [] counsel impeached [Officer Waldron] with [his] prior testimony."

*Broadwater v. United States*, 347 F. App'x 516, 520 (11th Cir. 2009). Accordingly, Ground One is denied.[4]

### B. Ground Two—Failure to Seek Exclusion of Testimony About K2

Henderson faults trial counsel for failing to seek exclusion of testimony concerning the suspected K2 that Officer Waldron found in the vehicle. (Doc. 1 at 8–9.) During his search, Officer Waldron located several packets of what he believed to be K2 in the passenger floorboard. (Doc. 13-2, Ex. 3, at 152.) Henderson had been sitting in the front passenger seat, and Officer Waldron decided to detain him based in part on his discovery of the suspected K2. (*Id.* at 147, 153–54.) Henderson claims that counsel should have sought to exclude any testimony about the suspected K2 on the ground that it was improper "prior bad act" evidence. (Doc. 1 at 8–9.)

The state postconviction court rejected this claim. It held that any motion to exclude "mention of the K2" would have been "meritless" because evidence of the suspected narcotics "did not constitute a 'prior bad act.'" (Doc. 13-2, Ex. 15, at 3.) The court explained that the suspected K2 "was found on the passenger side of the vehicle after a consensual search of the vehicle and constituted a primary reason [Henderson] was being detained." (*Id.*) Thus, the suspected K2 was "a reason for [Henderson's] detention," not a prior bad act, and "any argument that mention of the K2 should be suppressed would have been without merit." (*Id.*)

---

[4] Henderson also claims that trial counsel was ineffective for not "[f]amiliariz[ing] [t]hemselves [w]ith [t]he [c]ase." (Doc. 1 at 5.) But, other than the failure to impeach Officer Waldron with his deposition testimony, Henderson does not explain how counsel's alleged lack of preparation affected the trial. Thus, Henderson's vague, unsupported assertion that counsel was unprepared is insufficient to support an ineffective-assistance claim. *See Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (holding that "conclusory allegations unsupported by specifics" are insufficient to establish an ineffective-assistance claim).

The rejection of this claim was reasonable. "[A]lthough the issue of ineffective assistance . . . is one of constitutional dimension," a court "must defer to the state's construction of its own law when the validity of the [ineffective-assistance] claim . . . turns on state law." *Pinkney v. Sec'y*, *DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017). Here, the state court found that counsel was not ineffective for failing to seek exclusion of the suspected K2 because, under Florida law, the evidence "did not constitute a 'prior bad act.'" (Doc. 13-2, Ex. 15, at 3.) Thus, the state court "already has told us how the issue[] would have been resolved under state law had [counsel] done what [Henderson] argues [they] should have done." *Herring v. Sec'y. Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005). This Court is bound to defer to that determination.

Even if the issue were the Court's to decide, the ineffective-assistance claim would fail because the testimony in question was not prior bad act evidence. "[E]vidence of a crime that is inseparable from the crime charged or evidence which is inextricably intertwined with the crime charged is not [prior bad act] evidence." *Zamora v. State*, 60 So. 3d 510 (Fla. 3d DCA 2011). Both of the offenses with which Henderson was charged required the prosecution to prove that Officer Waldron was "engaged in the performance of a lawful duty" when Henderson attacked him. *Taylor v. State*, 740 So. 2d 89, 90 (Fla. 1st DCA 1999). As the state court explained, the discovery of the suspected K2 was "a primary reason [Henderson] was being detained." (Doc. 13-2, Ex. 15, at 3.) Thus, Officer Waldron's testimony about the suspected K2 was admissible because it was "relevant" to establish his performance of a lawful duty and, therefore, "an inseparable part of the [offenses] at issue." *Thompson v. State*, 76 So. 3d 1050, 1053 (Fla. 1st DCA 2011).

For all these reasons, the state court reasonably concluded that Henderson's counsel was not ineffective for failing to seek exclusion of the suspected K2. Thus, Ground Two is denied.

### C. Ground Three—Failure to Argue Double Jeopardy

Henderson contends that trial counsel was ineffective for failing to argue that his right against double jeopardy was violated because he was convicted of both resisting an officer with violence and battery on a law enforcement officer. (Doc. 1 at 11.) He contends that, because these two offenses allegedly contain "identical elements" and the prosecution sought to prove them through "identical acts of violence," counsel should have "file[d] a motion to dismiss" based on "the Double Jeopardy [C]lause." (*Id.*)

The state postconviction court rejected this claim, explaining that it was "without merit" under *State v. Henriquez*, 485 So. 2d 414 (Fla. 1986). (Doc. 13-2, Ex. 15, at 3.) *Henriquez* reaffirmed that, under Florida law, resisting an officer with violence and battery on a law enforcement officer "are separate offenses." 485 So. 2d at 415; *accord State v. Carpenter*, 417 So. 2d 986, 988 (Fla. 1982) ("While resisting arrest with violence and battery on a law enforcement officer are similar offenses, and while they usually happen in conjunction with one another, one does not necessarily involve the other."). In reaching that conclusion, the *Henriquez* court asked whether "a comparison of the statutory elements, without regard to the facts as alleged in the information or as adduced at trial, reveals that each offense requires proof of an element that the other does not." 485 So. 2d at 415. The court answered that question in the affirmative. It explained that "one could obstruct or oppose a law enforcement officer by threatening violence and still at the same time

not be committing a battery on the law enforcement officer." *Id.* Likewise, "the placement of an unwanted hand on an officer's arm qualifies as a battery, although no resistance or obstruction occurs." *Id.* Thus, *Henriquez* held that because the two offenses were "separate and distinct" "based on their statutory elements," "the intent of the legislature clearly [was] to provide for separate convictions and punishments." *Id.* at 415–16.

The state postconviction court found that any double-jeopardy argument would have been meritless under *Henriquez*, and that therefore counsel was not ineffective for failing to raise it. (Doc. 13-2, Ex. 15, at 3.) That conclusion was reasonable. The Double Jeopardy Clause bars "multiple punishments for the same offense." *United States v. Bobb*, 577 F.3d 1366, 1371 (11th Cir. 2009). "[W]here the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304 (1932). The prohibition on double jeopardy is a matter of federal constitutional law. *See Missouri v. Hunter*, 459 U.S. 359, 368 (1983) ("[W]e are not bound by the Missouri Supreme Court's legal conclusion that these two statutes violate the Double Jeopardy Clause."). But, in applying the Double Jeopardy Clause, this Court is bound by the Florida Supreme Court's "construction of that State's statutes," including its determination of whether certain criminal offenses have the same elements. *Id.*; *see also Tarpley v. Dugger*, 841 F.2d 359, 364 (11th Cir. 1988) ("In th[e] [double-jeopardy] context, we are bound to accept the Florida court's construction of that State's statutes.").

As the state postconviction court noted, the Florida Supreme Court has held that resisting an officer with violence and battery on a law enforcement officer are "separate and distinct" offenses "based on their statutory elements." *Henriquez*, 485 So. 2d at 415. That determination binds this Court. *See Deloach v. Wainwright*, 777 F.2d 1524, 1525 (11th Cir. 1985) (noting that, for double-jeopardy purposes, federal courts are "bound by the Supreme Court of Florida's interpretation of its legislative enactments"). And because the Court is bound to accept that the two offenses do not contain the same elements, it necessarily follows that no double-jeopardy violation occurred in this case. Thus, the state court reasonably concluded that counsel was not ineffective for failing to raise Henderson's meritless double-jeopardy argument. *See, e.g.*, *Reese v. Inch*, No. 4:19-cv-401-MW-MJF, 2021 WL 1132222, at *17 (N.D. Fla. Mar. 4, 2021) ("Because [petitioner's] proposed double jeopardy argument would have failed, counsel was not ineffective for failing to raise it."), *adopted by* 2021 WL 1118734 (N.D. Fla. Mar. 24, 2021); *Aranda v. Dep't of Corr.*, No. 20-80628-CV, 2021 WL 681691, at *5 (S.D. Fla. Jan. 20, 2021) (holding that "counsel reasonably could have concluded that any double jeopardy challenge to any of the charges would have failed" based on the Florida courts' "bind[ing]" determination that the relevant offenses contained "separate elements of proof"), *adopted by* 2021 WL 680707 (S.D. Fla. Feb. 22, 2021).

Ground Three is denied.

### D. Ground Four—Instruction on Statements Made by a Defendant

Henderson contends that trial counsel was ineffective for asking the trial court to give the standard jury instruction on statements made by a defendant. (Doc. 1 at 13–14.) The prosecution did not introduce any statements made by

Henderson during custodial interrogation. The jury did, however, hear testimony about his outburst in the patrol vehicle—"I whooped your p**sy ass, you motherf*****. I whooped your ass. Uh-huh. Take these handcuffs off." (Doc. 13-2, Ex. 3, at 165–66.) During the charge conference, Henderson's counsel asked the trial court to give the standard instruction on "[d]efendant's statements." (*Id.* at 225.) That instruction informs the jury that a "statement" "made by the defendant outside of court" "should always be considered with caution and be weighed with great care to make certain it was freely and voluntarily made." Fla. Std. Jury Instr. (Crim.) 3.9(b). The court noted that the instruction likely did not "appl[y]" in this case because it "deal[t] with more like custodial and interrogation-type statements." (Doc. 13-2, Ex. 3, at 225.) But, seeking to "err on the side of caution," the court agreed to read it to the jury. (*Id.* at 226.)

Henderson appears to contend that the reading of this instruction invited the jury to consider the "prejudicial statements" he made in the patrol vehicle. (Doc. 1 at 14.) As a result, the jury allegedly received an "inculpating impression [of his] character." (*Id.*) Henderson claims that, had counsel not sought the instruction, "[t]here is a good probability that the outcome of his proceeding would have been different." (*Id.*)

The state postconviction court rejected this claim on the ground that "[i]t [was] purely speculative as to whether the inclusion of the instruction had any effect on the outcome in this case." (Doc. 13-2, Ex. 15, at 3.) The court explained that, in the light of "the overwhelming evidence as to [Henderson's] guilt," "there [was] not a reasonable probability the result of [his] trial would have been different had the instruction not been given." (*Id.*)

The rejection of this claim was reasonable. To show prejudice under *Strickland*, Henderson must "establish a reasonable probability that, but for [the reading of the challenged instruction], the outcome at trial would have been different." *Reed*, 767 F.3d at 1261. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. "It is not enough for the [petitioner] to show that the error[] had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Henderson's unsupported speculation about the instruction's effect on the jury does not come close to "affirmatively prov[ing] prejudice" under *Strickland*. *Id.* There is no basis to conclude that the jury would have disregarded Henderson's statements had the instruction been omitted. And, setting those statements aside, the prosecution presented "overwhelming evidence" of Henderson's guilt. (Doc. 13-2, Ex. 15, at 3.) Thus, the state court reasonably concluded that Henderson failed to satisfy *Strickland*'s prejudice prong. *See Blackshear v. Sec'y*, No. 3:19-cv-1115-TJC-MCR, 2023 WL 2242548, at *8 (M.D. Fla. Feb. 27, 2023) ("While Petitioner may be correct about the main purpose of the instruction [on statements by a defendant] and that it may have been unnecessary to include it in his case [because he did not make a custodial statement], his allegation that its inclusion affected the outcome of his trial is speculative at best.").

Ground Four is denied.

### E. Ground Five—Denial of Motion for Mistrial

Finally, Henderson argues that the trial court violated his rights under the Fifth, Sixth, and Fourteenth Amendments by denying his motion for mistrial. (Doc. 1 at 16–17.) Henderson's counsel moved for a mistrial based on (1) Officer

Waldron's testimony that he believed Henderson was trying to kill him, and (2) Officer Waldron's use of the phrase "p\*\*sy ass" when recounting Henderson's outburst in the patrol vehicle. (Doc. 13-2, Ex. 3, at 167–68.) The court denied the motion, explaining that neither matter rose "to the level of mistrial." (*Id.* at 168.)

Respondent correctly contends that this claim is procedurally defaulted because Henderson failed to fairly present it on direct appeal. (Doc. 13 at 15–16.) In his appellate brief, Henderson challenged the denial of his motion for mistrial, but he did not "make the state [appellate] court aware that the claim" raised "federal constitutional issues." *Jimenez v. Fla. Dep't of Corr.*, 481 F.3d 1337, 1342 (11th Cir. 2007). His brief contained no reference to the United States Constitution or any other source of federal law. Nor did Henderson "label[] the claim 'federal.'" *Baldwin v. Reese*, 541 U.S. 27, 32 (2004). Instead, he relied entirely on Florida caselaw and statutes to support his argument that the trial court erroneously denied his motion for mistrial. (Doc. 13-2, Ex. 10, at 10–12.)

As a result, Henderson did not fairly present Ground Five to the state appellate court. He cannot return to state court to present the claim in a second direct appeal. *See* Fla. R. App. P. 9.140(b)(3) (stating that a notice of appeal must be filed within 30 days of the rendition of sentence). Despite this failure, the claim is technically exhausted. State-court remedies are exhausted "when they are no longer available, regardless of the reason for the unavailability." *Shinn v. Ramirez*, 142 S. Ct. 1718, 1732 (2022) (quoting *Woodford v. Ngo*, 548 U.S. 81, 92–93 (2006)). But Ground Five is procedurally defaulted because it was "not presented to the state courts 'consistent with [the State's] own procedural rules'" requiring the claim to be brought on direct appeal. *Id.* (quoting *Edwards v. Carpenter*, 529 U.S. 446, 453

20

(2000)). Henderson does not show that an exception applies to overcome the default. *See id.* Accordingly, Ground Five is barred from federal habeas review.

## V.    CERTIFICATE OF APPEALABILITY

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Henderson must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Henderson has not made the requisite showing. Finally, because Henderson is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Henderson's Petition for Writ of Habeas Corpus (Doc. 1) is **DENIED**. The **CLERK** is directed to enter judgment against Henderson and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida on October 16, 2023.

Kathryn Kimball Mizelle
United States District Judge

21